**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRADY YOUNG, | ) | CASE NO. 1:13-CV-1696 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Brady Young ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On October 28, 2010, Plaintiff filed his application for SSI, alleging a disability

onset date of January 18, 2008.  (Transcript ("Tr.") 14.)  The claims were denied initially

and upon reconsideration, and Plaintiff requested a hearing before an administrative

law judge ("ALJ").  (*Id.*)  On February 16, 2012, an ALJ held Plaintiff's hearing.  (*Id.*)

Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A

vocational expert ("VE") also participated and testified.  (*Id.*)  On April 6, 2012, the ALJ

found Plaintiff not disabled.  (Tr. 14-26.)  On July 8, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On August 6, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 20, 21.)

Plaintiff asserts the following assignment of error: (1) substantial evidence in the record supports a finding that Plaintiff's impairments medically equaled Listing 1.04(A) of the Listing of Impairments (the "Listings"); (2) substantial evidence does not support the ALJ's residual functional capacity ("RFC") finding because the ALJ failed to include additional limitations supported by the medical evidence in the record; and (3) evidence submitted to the ALJ after the administrative hearing requires remand.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in July 1970 and was 40 years old on the date he filed his application.  (Tr. 25.)  He had past relevant work as a paint mixer machine operator.  (*Id.*)

### B.  Medical Evidence

#### 1.  Medical Reports

On April 13, 2009, Plaintiff underwent a psychological evaluation at the request of his worker's compensation attorney, performed by Raymond D. Richetta, Ph.D.  (Tr. 214-18.)  Plaintiff, who had been incarcerated from 1993 until 2003, described himself

2

as sad, tearful and easily agitated by others as a result of his work-related injuries.  (Tr. 214-15.)  He described his social interaction as limited to a "small circle of friends," with whom he socialized by "gather[ing] at someone's place to talk or . . . repair or ride motorcycles."  (Tr. 216.)  Plaintiff found it "intermittently difficult to tolerate anyone else being with him due to his irritable mood."  (*Id.*)  At the time of his examination, Plaintiff had been attending church with a friend for about a month.  (*Id.*)  Plaintiff denied using street drugs.  (*Id.*)  Plaintiff reported that his hobby was "riding motorcycles."  (Tr. 217.)  Testing revealed a moderate to severe level of depression. (Tr. 218.)  Dr. Richetta diagnosed Plaintiff with Depressive Disorder Not Otherwise Specified.  (*Id.*)

On May 31, 2009, Plaintiff reported to the emergency department at South Pointe Hospital, complaining of chest pain and abdominal pain.  (Tr. 276-77.)  He told medical staff that he had consumed alcohol and used marijuana the night before.  (Tr. 277.)  An emergency room physician recommended that Plaintiff be admitted for a cardiac work up, but Plaintiff declined and signed himself out of the emergency department against medical advice.  (Tr. 278.)

The record contains one page from a June 17, 2009 history and physical description prepared by an unnamed person at Chagrin Medical Center.  (Tr. 219.)  The report notes Plaintiff's report that, in June 2006, he hit his right hand on a machine. (*Id.*)  Thereafter, he had received no treatment for the injury.  (*Id.*)  At the time of the report, Plaintiff reported severe swelling and pain in his right hand upon lifting.  (*Id.*)

On May 4, 2010, Lauchlin W. McKeigan, D.C., prepared a "letter of medical necessity" on Plaintiff's behalf, informing the Ohio Department of Rehabilitation and

Corrections that Plaintiff was "unable to bear weight [on his left knee] for extended periods of time without the use of a knee brace." (Tr. 438.) Dr. McKeigan noted that he had been providing Plaintiff with "post operative rehabilitation" after left knee surgery. (*Id.*)

In 2010, while incarcerated, Plaintiff made several complaints to prison medical staff regarding pain in his left knee. (Tr. 458, 461.) Prison medical staff noted that Plaintiff had undergone ACL repair in December 2009. (Tr. 458.) Plaintiff was treated with Motrin. (Tr. 461.) From July 21, 2010 through July 24, 2010, prison officials limited Plaintiff to standing for no longer than 15 minutes. (Tr. 487.) On July 28, 2010, Plaintiff reported to prison medical staff that he had fallen and had pain in his left knee. (Tr. 447.) Examination revealed a full range of motion, and no bruising or redness. (*Id.*) Medical staff instructed Plaintiff to use ice, heat and an Ace bandage, and to elevate his knee when possible. (*Id.*)

A January 4, 2011 x-ray of Plaintiff's left knee revealed a chronic stress deformity of the inferior patellar facet. (Tr. 323.) John Ryan, M.D., noted Plaintiff's complaints of instability and pain in his left knee. (Tr. 313.) Dr. Ryan noted that Plaintiff had undergone reconstructive and revision surgeries for the anterior cruciate ligament ("ACL") in that knee one year prior, but was unable to complete the follow up physical therapy. (*Id.*) Dr. Ryan recommended that Plaintiff undergo a supervised rehabilitation program. (Tr. 314.)

On January 24, 2011, Plaintiff was evaluated by pain management physician Lokesh Ningegowda, M.D., who noted Plaintiff's complaints of headaches, right-sided neck pain and upper right extremity pain. (Tr. 310-11.) Dr. Ningegowda recommended

4

that Plaintiff undergo right cervical facet diagnostic medial branch blocks.  (Tr. 312.)

A February 14, 2011 x-ray of Plaintiff's lumbar spine revealed normal alignment; no evidence of fracture or compression deformity; no significant spurring or intervertebral disc space narrowing; and no abnormal soft tissue calcification.  (Tr. 241.)

On February 26, 2011, Plaintiff reported to the emergency department at South Pointe Hospital, complaining of chest pains.  (Tr. 252-53.)  He stated that he had been involved in an argument that had escalated to the point that he had drawn a gun on the other individual.  (Tr. 261.)  Plaintiff informed medical staff that he had used cocaine the day before and that he smoked marijuana and drank beer.  (Tr. 253, 258.)  Emergency physicians diagnosed Plaintiff with chest pain, hyperlipidemia, hypertension, and chronic kidney disease.  (Tr. 270-71.)

On March 16, 2011, spine surgeon Gordon R. Bell, M.D., examined Plaintiff, who complained of pain in his right neck and shoulder, and numbness and weakness in his right hand.  (Tr. 319.)  Examination revealed normal strength and reflexes.  (*Id*.)  Dr. Bell recommended that Plaintiff obtain new x-rays and an MRI.  (*Id*.)

A May 24, 2011 MRI of Plaintiff's cervical spine revealed bulging disc protrusions at C2-C3, C3-C4, C4-C5, C5-C6, and C6-C7; as well as minimally and moderately stenotic foramina with moderate cord effacement, and no spinal cord edema.  (Tr. 329-30.)

On July 5, 2011, Plaintiff underwent a left ACL reconstruction performed by orthopedic surgeon Richard D. Parker, M.D..  (Tr. 342-43.)       Dr. Parker noted that Plaintiff had previously undergone an ACL reconstruction that had failed. (Tr. 342.)  A subsequent MRI of Plaintiff's left knee revealed that the graft of the ACL was intact.

5

(Tr. 345-46.)

On July 13, 2011, Dr. Gordon Bell noted that Plaintiff had obtained an MRI that revealed ossification of the posterior longitudinal ligament ("OPLL") with narrowing "up to C3 and down to C6-7," as well as a small central and right-side protrusion at the C5-C6 level. (Tr. 348.) Dr. Bell recommended a C5-C6 anterior cervical discectomy and fusion. (*Id*.) Dr. Bell advised Plaintiff that the procedure would not relieve his shoulder or neck pain, but would likely address his right arm pain. (*Id*.) An x-ray of Plaintiff's cervical spine, taken that same day, revealed mild disc space narrowing at C5-C6 with ostephyte formation of the endplates. (Tr. 351.)

On August 31, 2011, Plaintiff returned to Dr. Bell to discuss his surgical options. (Tr. 353.) Dr. Bell noted that Plaintiff had a herniated disc at C5-C6 and a protrusion at C4-C5, and recommended that Plaintiff undergo a C6 corpectomy with a C4-C5 and C5-C6 discectomy. (*Id*.) Dr. Bell cautioned that this procedure would address only Plaintiff's right arm pain, and not his neck pain. (*Id*.) Plaintiff agreed to talk to his worker's compensation attorney about obtaining approval for this procedure. (*Id*.)

On July 14, 2011, Gary Prybylski, D.C., completed a medical source statement. (Tr. 332-33.) He opined that Plaintiff could: lift a maximum of 10 pounds, stand and/or walk for one hour during an eight-hour workday; and sit for two hours in an eight-hour workday. (Tr. 332.) Dr. Pryblyski determined that Plaintiff could: rarely or never climb, stoop, crouch, kneel, crawl, push or pull; and occasionally balance, reach, handle or feel. (Tr. 332-33.) According to Dr. Pryblyski, Plaintiff should avoid heights and moving machinery, and required an additional period of rest during an eight-hour workday, as well as a sit/stand option. (Tr. 333.) Dr. Pryblyski opined that Plaintiff experienced

6

severe pain.  (*Id*.)

On July 18, 2011, John H. Nickels, M.D., completed a medical source statement. (Tr. 335-36.)  Dr. Nickels noted that he had treated Plaintiff since January 2007, when Plaintiff complained of severe low back pain and was determined to have herniated discs at l2-L3, L3-L4 and L4-L5.  (Tr. 335.)  Dr. Nickels stated that, as of January 2011 – when he had last treated Plaintiff – Plaintiff continued to complain of severe back and neck pain, radiating into his right shoulder.  (*Id*.)  Dr. Nickels opined that Plaintiff was "completely and totally disabled on a permanent basis" with no chance of recovery.  (Tr. 335-36.)

On October 11, 2011, neurosurgeon Matt J. Likavec examined Plaintiff, who complained of right arm pain and weakness.  (Tr. 421.)  Dr. Likavec noted "obvious atrophy" of Plaintiff's right deltoid and shoulder area, we well as weakness in the right extremity, including deltoids, biceps and grips.  (Tr. 422.)  Plaintiff's right deltoid was "obviously smaller" than his left.  (*Id*.)  Dr. Likavec recommended that Plaintiff undergo a C4-C5 and C5-C56 discectomy.  (*Id*.)

A November 22, 2011 x-ray of Plaintiff's lumbar spine revealed degenerative changes in the lower thoracic spine and the lumbar spine.  (Tr. 358.)  The scan showed disc space narrowing at L2-L3 and L3-L4.  (*Id*.)

On November 28, 2011, Dr. McKeigan examined Plaintiff, and noted Plaintiff's complaints of continued pain in his left knee.  (Tr. 357.)  Dr. McKeigan recommended that Plaintiff undergo a functional capacity evaluation.  (*Id*.)

On December 6, 2011, family practitioner Erron Bell, M.D., noted Plaintiff's

7

complaints of back pain and referred him to pain management. (Tr. 408.)

On December 8, 2011, physical therapist James P. LaMastra performed a functional capacity evaluation. (Tr. 359-62.) He opined that Plaintiff could: occasionally lift 30 pounds and frequently lift 20 pounds; frequently carry 20 pounds; occasionally push 33 pounds and occasionally pull 34 pounds. (Tr. 361.) Mr. LaMastra determined that Plaintiff could: frequently walk, kneel, stoop, handle, finger, sit, stand, reach in the immediate area with both hands, and reach overhead with his left hand. (*Id*.) Plaintiff could never crouch. (*Id*.)

A January 17, 2012 MRI of Plaintiff's lumbar spine revealed diffuse disc bulging between L2 and L5, causing multilevel central canal stenosis; focal disc protrusion at L3-L4 and L5-S1; and central disc protrusion and bilateral foraminal stenosis at the L4-L5 level. (Tr. 380-81.)

On March 7, 2012, Dr. Likavec examined Plaintiff, who complained of pain in his mid and low back, with numbness radiating into his thighs and genitals. (Tr. 488.) Plaintiff described difficulty walking, and weakness in his legs. (*Id*.) Dr. Likavec reviewed the January 2012 MRI. (*Id*.) Dr. Likavec "went over risks and options, including the fact that . . . as a young man with this problem [Plaintiff] should not be in a hurry to consider surgery." (*Id*.) Dr. Likavec recommended that Plaintiff consider "low grade therapy." (*Id*.)

### 2. Agency Reports

On January 17, 2011, agency consulting psychologist Herschel Pickholtz, Ed.D., performed a clinical interview and mental status examination. (Tr. 233-39.) Plaintiff

reported living with his girlfriend.  (Tr. 233.)  Plaintiff reported a history of incarceration

for rape, totaling 11 years, as well as having been molested by a neighbor.  (Tr. 233-

34.)  He denied using alcohol or drugs.  (Tr. 234.)  He described his relationship with his

co-workers as "okay."  (*Id*.)  Plaintiff reported that he had been released from prison two

months before the examination, and, since that time, hadn't socialized with "old friends,"

but socialized with relatives four times each month.  (Tr. 237.)  He stated that, if he had

money, he would ride motorcycles, as that was his hobby.  (*Id*.)

Dr. Pickholtz diagnosed Plaintiff with mild-to-moderate depressive disorder, not

otherwise specified; personality disorder, not otherwise specified, related to addictive

and anti-social features; and moderate pscyhosocial stressors, and assigned him a

global assessment of functioning ("GAF") score of 58.  (Tr. 238-39.)  Dr. Pickholtz

assigned Plaintiff mild impairments in the ability: to understand, remember and follow

instructions; and maintain attention and perform simple, repetitive tasks.  (Tr. 238.)  He

assigned Plaintiff moderate impairments in the ability to: relate to others, including co-

workers and supervisors; and withstand the stresses and pressures associated with

day-to-day work activities.  (*Id*.)

On January 26, 2011 agency consulting psychologist Patricia Semmelman,

Ph.D., performed a mental RFC assessment.  (Tr. 82-83.)  She determined that Plaintiff

was moderately limited in his ability to: complete a normal workday and workweek

without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; interact

appropriately with the general public; accept instructions and respond appropriately to

criticism from supervisors; and get along with coworkers or peers without distracting

them or exhibiting behavioral extremes.  (Tr. 82-83.)  In the "additional explanation"

section, Dr. Semmelman opined:

> [Plaintiff] can interact occasionally and superficially and
> receive instructions and ask questions appropriately in a
> smaller more solitary and less public to nonpublic work
> setting. He can coope with the ordinary and routine
> changes in a work setting which is not fast paced or of high
> demand.

(Tr. 83.)

On February 14, 2011, agency consulting physician Eulogio Sioson, M.D.,

performed a disability evaluation.  (Tr. 243-45.)  Plaintiff reported a three-year history of

back pain, with increasing intensity during the prior 18 months.  (Tr. 243.)  Dr. Sioson

noted Plaintiff's complaint that the pain was constant, and had spread down his right leg

and into his genitals.  (*Id.*)  Plaintiff reported pain with walking or standing for greater

than 10 minutes, climbing a flight of stairs or sitting for 30 minutes.  (*Id.*)  Dr. Sioson

noted that Plaintiff walked with a slight limp without any assistive device.  (Tr. 244.)

During Dr. Sioson's examination, Plaintiff declined to perform heel/toe walking

and squats.  (Tr. 244.)  Examination revealed no abnormalities in Plaintiff's extremities,

and Plaintiff was able to grasp and manipulate with both hands.  (*Id.*)  Dr. Sioson noted

that Plaintiff's lower back and neck were "very sensitive" to touch.  (*Id.*)  Straight leg

raising was negative with sitting, and revealed back pain at 15 and 30 degrees on the

left and right, respectively, while lying.  (*Id.*)  Manual muscle testing revealed normal

grasp, manipulation, pinch and fine coordination in both of Plaintiff's hands.  (Tr. 245.)

Plaintiff's cervical spine was below normal in all areas of range of motion (25/50 in

flexion; 0/60 in extension; 10/45 in lateral flexion to the right and left; 40/80 in right

rotation; and 30/80 in left rotation).  (Tr. 246.)  His dorsolumbar spine was also below

normal in all areas of range of motion (20/90 in flexion; 0/30 in extension; 10/30 in right

lateral flexion; and 8/30 in left lateral flexion).  (Tr. 247.)

      Dr. Sioson diagnosed Plaintiff with neck/back pain, but noted "no gross

radiculopathy, deformity or inflammatory changes in the joints."  (Tr. 244.)  He opined

that Plaintiff should be limited to light work.  (*Id*.)

      On March 8, 2011, agency consulting physician Gerald Klyop, M.D., performed a

physical RFC assessment.  (Tr. 81-82.)  He opined that Plaintiff could: lift 20 pounds

occasionally and 10 pounds frequently; and sit, stand and/or walk for six hours out of an

eight-hour workday.  (Tr. 81.)  He concluded that Plaintiff could: occasionally climb

ramps or stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders,

ropes or scaffolds.  (*Id*.)

      On August 18, 2011, agency consulting psychologist Jennifer Swain, Psy.D.,

performed a mental RFC assessment on reconsideration of the initial denial of

Plaintiff's application.  (Tr. 99-100.)  She assigned limitations similar to those assigned

by Dr. Semmelman, except that Dr. Swain concluded that Plaintiff was also moderately

limited in the ability to respond appropriately to changes in the work setting.  (Tr. 99-

100.)

      On September 7, 2011, agency consulting physician Anton Freihofner, M.D.,

performed a physical RFC assessment on reconsideration of the initial denial of

Plaintiff's application.  (Tr. 97-98.)  He assigned limitations similar to those assigned by

Dr. Klyop, except that Dr. Freihofner concluded that Plaintiff was limited in his ability to

use his lower extremities to push and/or pull.  (Tr. 97.)

C.    **Hearing Testimony**

1.    **Plaintiff's Hearing Testimony**

At his February 16, 2012 administrative hearing, Plaintiff testified as follows:

He experienced numbness and weakness in his right hand.  (Tr. 48.)  It caused him to be unable to grip anything with that hand, and he had limited motion on the right side.  (*Id*.)  Plaintiff had difficulty bending over to tie his shoes and performing certain personal hygiene tasks due to pain and weakness in his hand.  (Tr. 50.)

Plaintiff's left knee was weak, gave out, and "popped."  (Tr. 51.)  He had difficulty straightening the knee out if it had been bent for a long period of time.  (*Id*.)  Plaintiff could stand for 10 or 15 minutes before the knee locked up and grew weak.  (Tr. 52.)  If Plaintiff sat for too long, his backside grew numb and his knee locked up.  (*Id*.)  He could sit for a maximum of 20 minutes.  (Tr. 53.)

Plaintiff had "a lot of problems with walking," specifically, that his legs grew numb if he walked too far.  (Tr. 54.)  He had fallen three times in the prior month.  (*Id*.)  Plaintiff used a cane every day.  (Tr. 55.)  Plaintiff had tried walking to lose weight on the advice of his physicians, but he couldn't walk more than "a quarter mile, probably 75 feet, about 10 [houses] or so," before he needed to sit and rest.  (*Id*.)

Plaintiff had pain in his neck that was exacerbated by lifting his right arm above his head.  (Tr. 57.)  His back pain was worsened by bending, lifting, and walking.  (Tr. 58-59.)  He believed he could lift a maximum of ten pounds.  (Tr. 59.)

In response to the ALJ's questioning about Plaintiff's report to an emergency physician, in February 2011, that he had drawn a gun on another individual during an

12

argument, Plaintiff denied that the incident had occurred as reflected in the emergency room documentation. (Tr. 49.) Plaintiff testified that, "Someone had come over to my house and she had a gun and the gun fell out. I didn't have a gun because if I had a gun, I'd be in prison." (Tr. 49-50.)

    **2.    Vocational Expert's Hearing Testimony**

The ALJ described the following hypothetical individual of Plaintiff's age and work and educational background to the VE:

> [T]his person can perform sedentary work. . . . Can lift, carry, push or pull 20 pounds occasionally, ten pounds frequently. Can stand and walk for four hours out of an eight- hour day and can sit for six hours out of an eight hour day.
>
> Could occasionally use foot controls. Could occasionally use ramps, stairs, balancing, stooping, kneeling, crouching and crawling. Can maintain concentration and persistence to sustain routine and more complex tasks. He can interact occasionally and superficially with others and can receive instructions and ask questions appropriately in a smaller or solitary and less public to non-public work setting.
>
> He can cope with ordinary and routine changes in a work setting that is not fast paced. He cannot crouch and reach overhead with his dominant right upper extremity.

(TR. 64-65.) The VE noted that, although the ALJ indicated that the hypothetical individual would be capable of sedentary work, the ALJ had actually described a "compromised light" level of work. (Tr. 66.) The ALJ accepted the VE's clarification, and corrected his hypothetical to reflect light work with "those limitations in mind." (*Id*.) Finally, after discussion with the VE regarding the "no fast-paced" limitation, the ALJ added, "no strict production quotas." (Tr. 67-68.) The VE testified that he could not identify any jobs that the hypothetical individual could perform. (Tr. 68.)

13

The ALJ altered the hypothetical as follows:

> Now, if that same person had the ability to interact with
> others and, when I say others, I mean coworkers,
> supervisors and the general public on a superficial basis,
> and, that would be throughout the course of the day, would
> that alter the answer to the first hypothetical?

(Tr. 69.)  The VE opined that the hypothetical individual could perform work as an order

filler or deliverer.  (Tr. 69-70.)

The ALJ asked the VE whether a limitation related to manipulation would alter

the VE's testimony:

> Q:    Now, if the person . . . only had frequent
>       manipulation, fine or gross manipulation of the
>       dominant hand, would that affect the jobs that you
>       described?
>
> A:    No.
>
> Q:    And if that was changed to occasional, would it affect
>       the jobs you described?
>
> A:    Yes.
>
> Q:    And, how would it affect that?
>
> A:    He couldn't do those jobs.
>
> Q:    Okay.  Would there be other jobs that such a person
>       could be able to perform?
>
> A:    I don't believe so.  I think occasional reaching,
>       handling for unskilled jobs, it is a significant erosion of
>       the unskilled job base.

(Tr. 70.)

## D.    Post-Hearing Evidence

On June 29, 2012, Plaintiff's counsel submitted additional evidence in support of

Plaintiff's application.  (Tr. 508.)  The evidence was as follows:

On June 8, 2012, Anuj Daftari, M.D., examined Plaintiff, noting Plaintiff's complaints of pain, weakness and numbness in his right arm and hand; and low back pain that radiates into his leg and groin.  (Tr. 509.)  Dr. Daftari noted that Plaintiff had been seeing Dr. Likavec and "is planned to go for neck surgery shortly."  (*Id*.) According to the record, Plaintiff was scheduled for neck surgery on June 14, 2012. (Tr. 513.)  Examination revealed: 4/5 strength in Plaintiff's right upper limb and 5/5 in his left; decreased sensation throughout Plaintiff's right limb over L5 and S1 distribution; tenderness at the cervical paraspinals and trap to the right; moderately to severely decreased range of motion in Plaintiff's neck; and tenderness at the sactro-illiac joint on the right and the thoraco-lumbar paraspinal muscles on the right.  (Tr. 512-13.)

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate

that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Plaintiff has not engaged in substantial gainful activity since October 28, 2010.

2.   Plaintiff has the following severe impairments: degenerative disc disease of the cervical and lumbar spine; history of two left knee surgeries, repairing the anterior cruciate ligament and then revision surgery; and depression.

3.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

16

impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.  Plaintiff has the RFC to perform less than the full range of light work as defined in 20 C.F.R. 416.967(b).  Specifically, he can lift, carry, push or pull 20 pounds occasionally and 10 pounds frequently.  He can stand/walk for 4 hours of an 8-hour workday and sit for 6 hours of an 8-hour workday.  He can occasionally use foot controls.  He can occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl.  He can maintain concentration and persistence to sustain routine and more complex tasks.  He can interact superficially with co-workers, supervisors, or the public, and he can receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting.  He can cope with ordinary and routine changes in work setting which is not fast paced, meaning no strict production quotas.  He cannot reach overhead with right upper extremity and he is limited to frequent manipulation with his dominant (right) hand.

5.  Plaintiff is unable to perform any past relevant work.

6.  Plaintiff was born in July 1970 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.  Plaintiff has at least a high school education and is able to communicate in English.

*  *  *

9.  Considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.  Plaintiff has not been under a disability, as defined in the Act, since October 28, 2010, the date the application was filed.

(Tr. 16-26.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignment of Error**

Plaintiff argues that substantial evidence does not support: (1) the ALJ's conclusion with respect to Listing 1.04(A) of the Listings of Impairments; or (2) the ALJ's determination of Plaintiff's RFC. He also argues that new evidence merits remand in this case. None of Plaintiff's arguments has merit.

18

1.     **Listing 1.04(C)**

In his decision, the ALJ noted that, at step three of the relevant analysis, he was required to determine whether Plaintiff's "impairments or combination of impairments is of a severity to meet or medically equal the criteria of" one of the impairments in the Listings.  (Tr. 15.)  The ALJ indicated that he had considered whether Plaintiff's impairments met or equaled several Listings:

> While the record indicates that [Plaintiff] has severe impairments, none reaches the level of severity required by the [Listings] either singly or in combination.  No treating or examining physician has indicated findings that are consistent with the record as a whole, and would satisfy the severity requirement of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.
>
> In particular, the undersigned considered [Plaintiff's] physical impairments under the requirements of Listing 1.04A and B regarding disorders of the spine, but there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain with motor loss, sensory or reflex loss, and positive straight leg testing (both sitting or supine) or spinal arachnoiditis.  Furthermore, [Plaintiff] is not extremely limited in the ability to walk as required by 1.00[(B)(2)(b)] at 1.04C.

(Tr. 16-17.)

Plaintiff argues that substantial evidence does not support the ALJ's conclusion with respect to the Listings because the ALJ failed to consider whether Plaintiff's impairments medically equaled Listing 1.04(A).  That Listing addresses disorders of the spine:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

19

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04(A).

In support of his argument, Plaintiff points to the scans of his spine contained in the record, which reflect bulging and herniated discs, foraminal and canal stenosis, and degenerative disc disease.  (Plaintiff's Brief ("Pl. Br.") at 11-12.)  Plaintiff does not explain, however, how these medical findings establish that his impairment met the requirements of the Listing, as none of the scans demonstrate the "compromise of a nerve root" necessary to satisfy Listing 1.04(A).  To the extent that Plaintiff cites to this evidence to demonstrate that he had a spinal impairment, review of the ALJ's decision reveals that the ALJ determined that Plaintiff suffered from such an impairment.  The ALJ listed "degenerative disc disease" as one of Plaintiff's severe impairments, and the decision contains a detailed description of the treatment and diagnostic procedures Plaintiff underwent with respect to his spine.  (Tr. 16, 19-24.)

Plaintiff also argues that the medical evidence regarding his complaints of pain and physical limitations substantially supports the conclusion that his back impairment medically equaled Listing 1.04(A).  Specifically, Plaintiff points to evidence regarding his complaints of back pain, as well as evidence of his loss of flexibility and range of motion in his back, his right arm weakness, and his loss of grip strength in his right hand.  According to Plaintiff, this evidence substantially supports a finding that his impairment medically equaled Listing 1.04(A).

20

Plaintiff's arguments are unavailing.  Review of the decision reveals that the ALJ discussed all of the medical evidence upon which Plaintiff relies.  The ALJ, however, concluded that, despite this evidence, Plaintiff's impairment was not severe enough to medically equal the Listing.  (Tr. 15, 16-17.)  Substantial evidence supports this determination.  The ALJ pointed to medical evidence in the record reflecting Plaintiff's physical capabilities, including the ability to: lift and carry weights of 10 pounds frequently and 20 pounds occasionally; to sit, stand and/or walk for specified lengths of time during an eight-hour workday; and to reach, handle and feel with his upper extremities.  (Tr. 22-23.)  The ALJ also concluded that Plaintiff's allegations of disabling pain were not entirely credible, and pointed to: Plaintiff's statement during a consultative examination that he rode motorcycles despite complaining of disabling neck, back and knee pain; evidence in the record that Plaintiff used cocaine and alcohol despite telling medical providers that he did not drink or use drugs; and evidence that Plaintiff did not pursue physical therapy or other vocational rehabilitation opportunities that were presented to him.  (Tr. 22.)  Plaintiff does not challenge this adverse credibility determination.

Review of the decision reflects that the ALJ did consider whether Plaintiff's back impairment met or medically equaled Listing 1.04(A).  The ALJ concluded that, although Plaintiff suffered from degenerative disc disease – a condition enumerated in the Listing – the impairment was not sufficiently severe to meet or medically equal the Listing.  The ALJ relied on evidence in the record to reach this conclusion.  Accordingly, substantial

21

evidence supports the ALJ's conclusion on this issue.[1]

### 2. Plaintiff's RFC

Plaintiff contends that substantial evidence does not support the ALJ's calculation of his RFC, for two reasons. First, Plaintiff argues that the ALJ erred in failing to limit him to "occasional" interactions with the public and coworkers. Second, Plaintiff argues that the ALJ erred in failing to limit Plaintiff to "occasional" fine or gross manipulation with his dominant hand. These arguments lack merit because substantial evidence supports the ALJ's determination of Plaintiff's RFC.

### A. Limitation on Social Interaction

In his decision, the ALJ acknowledged that agency consulting psychologist Dr. Semmelman had concluded that Plaintiff was limited to occasional interaction with coworkers and the general public. (Tr. 24.) The ALJ, however, declined to grant great

---

[1] Plaintiff also argues that the ALJ erred in failing to "obtain medical expert testimony" to determine whether Plaintiff's impairments met or equaled Listing 1.04(A). (Pl. Br. at 14.) Although the ALJ has a duty to ensure that a reasonable record has been developed, *see Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986), it is incumbent upon the claimant to provide an adequate record upon which the ALJ can make an informed decision regarding the claimant's disability status, *see Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). The agency recognizes that "an ALJ *may* need to consult a medical expert to gain more insight into what the clinical signs and laboratory findings signify in order to decide whether a medical opinion is well-supported or whether it is not inconsistent with other substantial evidence in the case record." Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions, SSR 96-2P, 1996 WL 374188 (S.S.A July 2, 1996) (emphasis added). The Sixth Circuit, however, has determined that "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). Here, Plaintiff does not articulate any reason – other than his disagreement with the ALJ's conclusion – to support his argument that the ALJ erred in failing to obtain testimony from a medical expert. Accordingly, there is no basis to conclude that the ALJ abused his discretion in failing to obtain additional testimony at the hearing in this case.

weight to that portion of the consultant's opinion:

> Based on the evidence as a whole, [Plaintiff] is not as limited as he claims or as determined by the State agency consultants. [Plaintiff] has no problem communicating with any of his treating or examining physicians. He has not sought any treatment for any psychological condition. At the hearing, I asked him about an Emergency Room record indicating that he pulled a gun on an acquaintance during an argument. [Plaintiff] strongly denied having a gun or pulling a gun on anyone. From all of this, I conclude that [Plaintiff] can superficially interact with others as opposed to superficial and occasional interaction.

(Tr. 24.)

Plaintiff argues that substantial evidence does not support the ALJ's conclusion on this issue because there is "no evidence" in the record that "contradict[s] the limitations assigned by the reviewing physicians." (Pl. Br. at 15.) According to Plaintiff, during his questioning of the VE, the ALJ "took out that one limitation which would have resulted in a favorable decision." (*Id.* at 15-16.)

This argument is unavailing. It is, of course, well established that, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."); *see also* SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

23

Here, however, the ALJ identified reasons – based on evidence in the record – for declining to adopt this portion of the consultants' opinions.  As noted by the ALJ, the record reflects Plaintiff did not seek any treatment for psychological conditions, and no examining or treating medical professional noted that Plaintiff had any difficulty interacting during his examination.  (Tr. 24.)  Further, as discussed earlier in the ALJ's decision, Plaintiff reported that he had a girlfriend, socialized with friends and occasionally attended church.  (Tr. 17.)  These findings, which are apparent from the record, constitute substantial evidence in support of the ALJ's conclusion that Plaintiff was capable of superficial – as opposed to occasional superficial – interaction with others.

### B.    Limitation on Manipulation with the Dominant Hand

In his determination of Plaintiff's RFC, the ALJ assigned Plaintiff limitations on the use of his right hand and arm: "[Plaintiff] cannot reach overhead with the right upper extremity and he is limited to frequent manipulation with his dominant (right) hand."  (Tr. 18.)  Plaintiff argues that the ALJ erred in failing to limit Plaintiff to occasional manipulation with his right hand.  (Pl. Br. at 16.-17.)  Plaintiff points to evidence in the record that he experienced weakness and atrophy of the muscles in his right arm, and evidence of his own complaints of right side weakness and an inability to grip with his right hand.  (*Id*.)

Plaintiff's argument lacks merit.  His argument on this point relies principally on the October 2011 examination conducted by Dr. Likavec, who noted Plaintiff's complaints of pain and weakness, as well as evidence of weakness and atrophy in Plaintiff's right arm.  (Tr. 421-22.)  Dr. Likavec, however, did not opine regarding the

physical limitations that resulted from his medical observations.  In fact, the only opinion in the record limiting Plaintiff to occasional use of his right hand for manipulation was a chiropractor, Dr. Prybyski.  The ALJ assigned Dr. Prybyski's opinion "little weight," noting "It is not from an acceptable source but more importantly, there is no evidence that Dr. Prybyski ever examined [Plaintiff], treated [Plaintiff], or reviewed his medical record." (Tr. 23.)  Plaintiff does not challenge the ALJ's assessment of Dr. Prybyski's opinion.

Further, the record contains medical opinions that Plaintiff was not limited to occasional manipulation with is right hand.  During his February 2011 consultative examination of Plaintiff, Dr. Sioson noted that Plaintiff was "able to grasp and manipulate with each hand." (Tr. 244.)  Consulting physician Dr. Klyop concluded that Plaintiff had no manipulative limitations. (Tr. 82.)  Consulting physician Dr. Freihofner also assigned Plaintiff no manipulative limitations. (Tr. 98.)  In his decision, the ALJ: discussed Dr. Sioson's findings; acknowledged Dr. Klyop's opinion; and assigned Dr. Freihofner's opinion great weight because it was "supported by objective testing and by the physical consultative examination as well as other examinations in the record." (Tr. 23.)  In other words, the ALJ based his conclusion that Plaintiff was limited to frequent manipulation with his right hand on medical opinions in the record.  Accordingly, substantial evidence support his conclusion on this point.

### 3.    New Evidence

Finally, Plaintiff argues that new evidence merits remand in this case. (Pl. Br. at 17-18.)  Specifically, Plaintiff points to the record from the June 2012 examination by Dr. Daftari.  According to Plaintiff, evidence of his decreased strength, sensation, range

25

of motion and reflexes are all relevant to the issue whether his impairment satisfied Listing 1.04(A).  (Pl. Br. at 17.)  He also contends that the ALJ would have rendered a different opinion in this matter had he known that Plaintiff was scheduled to undergo neck surgery.  (Pl. Br. at 18.)

Under 42 U.S.C. § 405(g), a court "may . . . remand [a] case to the Commissioner . . .  for further action by the Commissioner . . . and it may at any time order additional evidence to be taken before the Commissioner . . . , but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  The party seeking remand under § 405(g) bears the burden of showing that remand is appropriate.  *See, e.g., Sizemore v. Sec. of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).  "In order for the claimant to satisfy this burden of proof as to materiality, he must demonstrate that there was a reasonable probability that" the Commissioner "would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*

Here, Plaintiff has not met his burden of proof with respect to materiality. Although the new evidence reflects that Plaintiff continued to experience pain, reduced strength, decreased strength and diminished reflexes, particularly on his right side, nothing in the medical records post-dating his February 2012 administrative hearing suggest that he was experiencing new symptoms.  The fact that Plaintiff was scheduled for surgery was merely cumulative of evidence in the record that physicians had recommended surgery to address his condition.  The new record does reflect that Dr. Likavec – who had previously counseled against surgery – was now proceeding with

26

surgery on Plaintiff's neck.  The record does not, however, reflect why Dr. Likavec had changed his opinion.  Nor does it reflect additional limitations on Plaintiff's capabilities. Accordingly, there is no basis for concluding that the outcome of his disability claim would have been different had Plaintiff presented this new evidence.  Accordingly, there is no basis to remand this case to the agency.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 29, 2014

27